# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SAMUEL C. WILLIAMS, IV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-cv-1900 (TSC) |
| | ) | |
| | ) | |
| SMITHSONIAN INSTITUTION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Samuel C. Williams, IV sued his former employer, the Smithsonian Institution, alleging race discrimination and retaliation for protected activity under Title VII of the Civil Rights Act of 1964. Pursuant to Federal Rule of Civil Procedure 56, the Smithsonian moves for summary judgment on both claims. ECF No. 37. For the reasons set forth below, the court will GRANT the Smithsonian's motion.

## I.    BACKGROUND

### A.  Williams' Hiring

Williams, who is African American, was employed by the Smithsonian as a Management and Program Analyst (MPA) in the Systems Engineering Division, Work Management Center (WMC), Office of Facilities Management & Reliability (OFMR), between November 2012 and August 2013. ECF No. 37 ("Def.'s Stmt. Mat. Facts") ¶¶ 1, 36.

When Williams applied for the MPA position, WMC Supervisor Enos Scragg required him to complete two evaluations: an Excel assessment and a writing sample. ECF No. 39-1, Ex.

D ("Williams Dep.") at 15:25–16:19.[1]  The posting announcing the vacant position, however, did

not indicate that any tests were necessary.  ECF No. 39-1 ("Pl.'s Ex. A") at 000003.  Scragg,

who is Caucasian, hired Williams and became his supervisor in the WMC.  Def.'s Stmt. Mat.

Facts ¶ 1.  Williams' employment at the Smithsonian was subject to a one-year probationary

period, which the Smithsonian uses "to determine the fitness of the employee and shall terminate

his services during this period if s/he fails to demonstrate fully his qualifications for continued

employment."  *Id.* ¶ 2.  During Williams' first year at the Smithsonian, his supervisor was to

"continually assess [his] performance during [the] probationary period and may make a

determination regarding [his] continued employment at any time during the probationary

period."  *Id.*  Williams was informed that the probationary period was "a highly significant and

final step in the examining process."  *Id.*

### B.  Management Project Analyst Position

The OFMR provides maintenance, repair, and other building services to more than 400

facilities owned by the Smithsonian.  *Id.* ¶ 3.  Within the OFMR, the WMC is the "key work

control point for distributing and tracking facilities work throughout the Institution."  ECF No.

---

[1] The court notes that Williams' opposition brief to the Smithsonian's motion for summary judgment failed to comply with Local Rule 7(h), which states that "[a]n opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated …."  LCvR 7(h).  Rather than submitting a separate statement of disputed material facts, Williams included a sparse and loosely-organized adaptation of this statement in the body of his opposition brief and did not identify exactly which of the Smithsonian's proffered facts he disputes.  A strict reading of Local Rule 7(h) would permit the court to treat all of the Smithsonian's facts as admitted by Williams.  *Id.* ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").  Nevertheless, the court will overlook this insufficiency in Williams' pleadings and proceed by treating the relevant section of his opposition brief as if it complied with Local Rule 7(h).

37-9.  Specifically, the WMC uses a computerized maintenance management system (CMMS) to manage service requests, maintain equipment inventories, schedule equipment testing and inspection, track labor, materials, venders, and contractors, and manage required data and status update reports for Smithsonian facilities in the Washington, D.C. area.  Def.'s Stmt. Mat. Facts ¶ 4.  An MPA in the WMC performs "detailed-critical work" that requires close attention to ongoing tasks and near-perfect accuracy.  *Id.* ¶ 5.

Williams' performance plan in the WMC had five elements: (1) analysis and management of computerized maintenance management system processes and activities; (2) customer service and unit staff support; (3) analysis and management of program performance; (4) safety, health, and security; and (5) professional development and teamwork.  *Id.* ¶ 6.  The first element required that Williams "[c]onduct[] highly complex, non-routine entry or corrections to data records lacking defined procedures as needed or requested," demonstrate a "minimal need for supervisory direction," and meet a minimum accuracy level of 95 percent.  *Id.* ¶ 7.  The second element required Williams to "[s]erve as CMMS subject matter expert on all scheduled maintenance activities and associated processes."  *Id.* ¶ 8.  The third element required "the effective use of queries, pivot tables, formulas and macros in work assignments resulting accuracy [sic] and consistent output during the performance period."  *Id.* ¶ 9.  The parties do not focus on the specific requirements of the fourth and fifth elements of Williams' performance plan.

### C.  Williams' Job Performance

During the first few months that Williams worked at the Smithsonian, he processed tickets for facility maintenance, which would "come in by the hundreds" daily.  Williams Dep. at 35:23–25.  The parties dispute whether the ticketing work was included in Williams' duties, or

whether customer service representatives were supposed to complete these assignments. ECF No. 39 ("Pl.'s Opp'n") at 3; ECF No. 40 ("Def.'s Reply") at 4–5. Williams also asserts that he was responsible for completing more of the ticketing work than other MPAs. Williams Dep. at 35:7–37:8.

Soon after Williams began working in the WMC, Scragg found that Williams' "Excel skill set was weak." Def.'s Stmt. Mat. Facts ¶ 10. In addition to discussing Williams' work performance with him on a "daily and weekly basis," Scragg held weekly meetings with WMC staff, including Williams, during which Scragg discussed employees' work request statistics and accuracy rates. *Id.* ¶¶ 11–12. John Kerns, Williams' co-worker and the WMC team lead, also observed errors with Williams' work involving job plans and preventative maintenance schedules. *Id.* ¶ 13.

During Williams' mid-year performance appraisal on April 16, 2013, Scragg informed him that his accuracy rate was 94 percent, just below the established minimum accuracy rating of 95 percent required by his performance plan. *Id.* ¶¶ 15, 17. Scragg noted that Williams' performance was "developing well" and, notwithstanding Williams' accuracy rating, was "confident [Williams was] the right person for this role." ECF No. 37-16 ("Def.'s Ex. 16") at 9. Scragg instructed Williams to focus on improving his accuracy, self-reviewing his work, and reviewing standard operating procedures. *Id.*

Between April 16, 2013, and July 17, 2013, Williams' accuracy rate decreased to 90.6 percent and his average response time doubled, from 0.09 hours to 0.18 hours. Def.'s Stmt. Mat. Facts ¶¶ 17, 20. During this period, Williams had the lowest accuracy rating in the WMC by 7.6 percent. *Id.* ¶ 22. He and one other employee were tied for the longest response time. *Id.* ¶ 23.

In or around late June or early July 2013, Scragg held Williams responsible for major data errors in preventative maintenance schedule plans. *Id.* ¶ 26. Before leaving for a vacation, Williams produced 73 job plans, but did not review his work. *Id.* ¶¶ 26–27. The errors in the plans caused the WMC to lose approximately one week of work product, generated confusion throughout the Smithsonian, and took four weeks to fully correct. *Id.* ¶¶ 28–29. Williams claimed that a system error was responsible for the erroneous work product. Williams Dep. at 66:3–73:19. Dan Boyle, a co-worker, told Williams that the error "was a systems malfunction rather than a user error." *Id.* at 72:14–16.

Scragg acknowledged that systemic issues were the underlying cause of the error, but he contended that Williams, who was expected to be an expert in the system, should have quickly identified the error had he reviewed his work and followed standard operating procedures. *Id.* ¶ 30; Williams Dep. at 72:25–73:19. Williams then e-mailed Scragg on July 5, 2013 to request a copy of the relevant standard operating procedures. *Id.* at 73:21–75:10; Pl.'s Ex. A at 000041–42. In response, Scragg explained that "[t]he procedure I referred to is the standing expectation that any work done is reviewed for errors. If you had double checked the job plans you created to verify the procedures and work tasks had been generated properly, the system error would have been discovered sooner." Pl.'s Ex. A at 000041. Williams' attempts to address the errors contained mistakes that other WMC employees subsequently had to correct. Def.'s Stmt. Mat. Facts ¶ 28.

### D. Scragg's Use of Pre-Employment Tests and Williams' Exchanges with Katherine Simenton

Soon after he was hired by the Smithsonian, Williams requested a copy of his pre-employment test results from Katherine Simenton, in the Personnel Unit of the Business Operations Division of the OFMR. Pl.'s Ex. A at 000003. Simenton informed him that no tests

were required for his position.  *Id.*  Scragg states he requested that applicants complete the two assessments because the skills they tested were important to the MPA position.  Def.'s Mot. S.J. at 16; ECF No. 37-10 ("Scragg Dep.") at 54:1–6, 59:4–61:21.  Scragg also asserts that each time he was the hiring official for a vacant position, he requested that every applicant submit the same information, including the pre-employment tests.  *Id.* at 51:7–12; 128:15–21.

While assisting with an interview panel for a vacant MPA position in or around May 2013, Williams heard Scragg, the hiring official, ask an African American applicant if the applicant had submitted a written test.  Pl.'s Ex. A at 000003.  After the candidate refused to complete the tests on the grounds that they were not required by the vacancy posting, Scragg instructed the panel to remove the candidate's name from the pool of applicants.  *Id.*  Tamia Rush, who is also African American, was ultimately hired to fill the position.  *Id.*  She later told Williams that she had been required only to submit a writing sample during the application process.  *Id.*  Scragg claims that, by this time, he had decided to eliminate the Excel component of the assessment "because he lost faith that he was getting accurate results."  Scragg Dep. at 56:6–12.  Scragg later discontinued the writing sample as well.  *Id.* at 56:6–20.

In early July 2013, Williams, allegedly confused by how Scragg handled the system malfunction issue and concerned by the "disparity in job requirements," spoke to Simenton about the pre-employment tests and "expressed to her his belief it was discriminatory."  Pl.'s Ex. A at 000003.  Simenton told him that Scragg had previously been informed that the two evaluations fell outside of the Smithsonian's Office of Personnel Management's guidelines.  *Id.*  On July 9, 2013, Williams met with Simenton to "discuss inconsistencies with pre-employment tests that were given to Tamia Rush . . . and [himself]."  *Id.* at 000014.  During this conversation, Simenton reiterated that such tests were prohibited unless included on the position announcement

and said she had informed Scragg that pre-employment testing was "illegal." Williams Dep. at 124:2–125:17. Later that day, Scragg stopped at Williams' cubicle while Williams was talking to co-worker Chris Butler. Pl.'s Ex. A at 000033. Scragg remarked, "What kind of trouble are you troublemakers getting into?" *Id.* When Williams and Butler asked what Scragg meant, Scragg "replied with a snicker and walked off." *Id.*

### E. Williams' Termination from the Smithsonian

Citing Williams' unsatisfactory performance as an MPA and his inability to accept responsibility for errors in his work, Scragg notified Williams on July 23, 2013 that he would be terminated from his employment at the Smithsonian prior to the end of his probationary period.[2] Scragg Dep. at 82:20–83:3. Scragg had previously discussed the decision to fire Williams with Scragg's supervisor, Kendra Gastright, the OFMR director. Def.'s Stmt. Mat. Facts ¶ 35; Pl.'s Ex. A at 000003. Williams' termination became effective August 6, 2013. Def.'s Stmt. Mat. Facts ¶ 36.

On July 29, 2013, six days after Williams received notification of his termination, he sought counseling from an Equal Employment Opportunity ("EEO") counselor at the Smithsonian. *Id.* ¶ 38. He subsequently filed a formal complaint with the Smithsonian's Office of Equal Employment and Minority Affairs ("OEEMA"), the agency's EEO office, on March 10, 2014. *Id.* ¶ 39. In his complaint, Williams claimed he had been subject to discrimination on the basis of race when Scragg required him to take two pre-employment tests. *Id.* ¶ 40. Williams also submitted a retaliation complaint, alleging that he was fired because he had expressed

---

[2] Williams' claim that he received notice of his termination "without any counsel from Enos Scragg about poor performance" is contradicted by the undisputed facts. Pl.'s Opp'n at 6. Williams does not dispute that he received a mid-year performance review from Scragg on April 16, 2013 during which he learned his accuracy rating was below the minimum standard. Def.'s Stmt. Mat. Facts ¶¶ 15, 17.

concerns about Scragg's use of the pre-employment assessments. *Id.* ¶ 42. OEEMA completed its investigation and issued its Report of Investigation to Williams (included in the record) on September 11, 2014. *Id.* ¶ 51. Additionally, Williams filed a complaint with the U.S. Office of Special Counsel, reiterating the claims that he made in his EEO complaint. ECF No. 37-6 at 181:2–15. After conducting an initial investigation, the Office of Special Counsel elected not to take further action. ECF No. 37-30.

### F. Procedural History

The Smithsonian previously filed a motion to dismiss Williams' retaliation claim and his claim that the Smithsonian denied him training opportunities on account of race. ECF No. 6. The court dismissed Williams' failure-to-train claim because Williams conceded that he had failed to exhaust his administrative remedies. *Williams v. Smithsonian Inst.*, 177 F. Supp. 3d 331, 334 (D.D.C. 2016). The court denied the Smithsonian's motion to dismiss the retaliation claim, finding that Williams had established a prima facie case for retaliation. *Id.* at 6. The Smithsonian has now moved for summary judgment on Williams' remaining discrimination and retaliation claims, ECF No. 37.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A dispute of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 251, 251–52 (1986). A dispute is "material" only when it involves facts "that might affect the outcome of the suit under the governing law." *Id.* at 248. In determining

whether a genuine issue of material fact exists, the court must view all facts in the light most

favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986). The moving party "bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of the 'pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits . . .' which it

believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at

323. In response, the nonmoving party must "go beyond the pleadings" and identify specific

facts which show there is a genuine issue for trial. *Id.* at 324. To preclude summary judgment,

the nonmovant must "provide evidence that would permit a reasonable jury to find [in his

favor]." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (citations omitted).

In evaluating a motion for summary judgment, "the judge's function is not . . . to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Liberty Lobby*, 477 U.S. at 249. The court must "eschew making credibility

determinations" at the summary judgment stage. *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C.

Cir. 2017). However, "[i]f the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (citations omitted).

And "conclusory assertions offered without any evidentiary support do not establish a genuine

issue for trial." *Wang v. Wash. Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 63 (D.D.C. 2016)

(citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)).

## III.   ANALYSIS

### A.  Williams' Discrimination Claims

Title VII's anti-discrimination provision prohibits employers from "discriminat[ing]

against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color . . . or national origin." 42 U.S.C. § 2000e-2(a). Title VII claims may be proved by direct or circumstantial evidence. *See Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). Where, as here, a plaintiff has offered indirect evidence of Title VII discrimination, the court applies the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether summary judgment is appropriate. Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination in violation of Title VII. 411 U.S. at 802. In order to do so, the plaintiff must show: (1) he belongs to a protected class under Title VII, (2) he experienced an adverse employment action, and (3) the adverse employment action yields an inference of discrimination. *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008). If the plaintiff meets his burden of establishing a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking the relevant action. *Id.* at 144. In the event that the employer proffers such a reason, the burden shifts back to the plaintiff to demonstrate that the employer's purported justification for the adverse employment action was merely a pretext for unlawful discrimination. *Id.*

The D.C. Circuit has found that the question of whether the plaintiff in a Title VII discrimination case actually established a prima facie case is "almost always irrelevant." *Brady*, 520 F.3d at 493. When "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. *Id.* at 494 (emphasis in original). The summary judgment analysis instead must focus on "one central question":

Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

*Id.*

Recently, this Circuit clarified that *Brady's* singular focus on the "pretext" phase of the *McDonnell Douglas* analysis is merely a "shortcut" and does not "imply that the District Court may relieve the employer of its burden, at the second prong, to articulate a legitimate, nondiscriminatory reason for its action." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (internal quotation marks and citation omitted). For the *Brady* rule to apply, "an employer at the second prong must proffer admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions." *Id.* at 1092. And the evidence the employer presents "must suffice to raise a triable issue of fact as to intentional discrimination and to provide the employee with a full and fair opportunity for rebuttal." *Id.*

### 1. Administration of Pre-Employment Tests

Although Williams' Complaint alleges unlawful discrimination only in his termination from the Smithsonian, ECF No. 19 ("Sec. Amend. Compl.") ¶ 56, his subsequent pleadings suggest that the Smithsonian committed a separate act of discrimination by requiring him to take two pre-employment tests. *See* Pl.'s Opp'n at 12. This allegation requires an inquiry into the prima facie stage of the *McDonnell Douglas* framework, since the facts in the record do not clearly establish that Williams suffered any adverse employment action. *See Wang*, 206 F. Supp. 3d at 65 ("Of course, in a case in which an employer's action does not clearly qualify as an adverse employment action, the court still must first determine whether plaintiff suffered an adverse employment action.") (internal quotation marks and citations omitted).

An adverse employment action requires "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)).  To qualify, an employer's conduct must cause a plaintiff-employee to "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could objectively find tangible harm." *Douglas v. Preston*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).  In most cases, a tangible employment action "inflicts direct economic harm." *Burlington Indus.,* 524 U.S. at 762.

Williams has not met his burden of showing that he suffered an adverse employment action because he was required to take the pre-employment tests.  Notwithstanding the testing requirement, Williams was hired for the MPA position for which he applied.  In his pleadings, he has not identified any objectively tangible harm he suffered because Scragg required him to complete the Excel test and writing sample.  Williams' concerns about the fairness and discriminatory nature of the evaluations do not, without more, establish that they constitute an adverse employment action.  *See Douglas*, 559 F.3d at 552 ("not everything that makes an employee unhappy is an actionable adverse action"); *Jones v. Bush*, 160 F. Supp. 3d 325, 346 (D.D.C. 2016) (finding that entirely subjective harm such as employee dissatisfaction, embarrassment, injury to reputation, and "disrespectful treatment" does not qualify as an adverse employment action).  And while Williams claims that his assignment to maintenance ticketing tasks during his first three months at the Smithsonian fell outside of his job responsibilities, he

does not argue that this initial work assignment independently constituted an adverse employment action caused by his performance on the pre-employment evaluations.[3]

### 2. Williams' Separation from the Smithsonian

Williams primarily contends that the Smithsonian intentionally discriminated against him on account of race by firing him during his probationary period. That Williams' termination is an adverse employment action under Title VII is not in dispute. Therefore, the court need not conduct a threshold analysis of whether Williams established a prima facie case of discrimination before assessing the sufficiency of the Smithsonian's non-discriminatory explanation for discharging him. *See Brady*, 520 F.3d at 494.

> #### a. The Smithsonian has presented a legitimate, nondiscriminatory explanation for terminating Williams' employment.

To determine if the Smithsonian proffered adequate evidence of a legitimate, nondiscriminatory reason for firing Williams, the court considers (1) whether the evidence would be admissible at trial (or at the summary judgment phase); (2) whether the factfinder, if it believes the evidence, "must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) whether the employer's nondiscriminatory explanation is "facially credible in light of the proffered evidence"; and (4) whether the employer's evidence presents a "clear and reasonably specific explanation" that provides the employee with "a full and fair opportunity to attack the explanation as pretextual." *Figueroa*, 923 F.3d at 1087–88. As

---

[3] A plaintiff may prove unlawful discrimination under Title VII by showing that either (1) "the employer acted with a discriminatory motive" (disparate treatment), or (2) "its action was the result of a process that, while apparently fair in form, was discriminatory in operation" (disparate impact). *Davis v. Dist. of Columbia*, No. 17-7071, 2019 WL 2398007, at *5 ((D.C. Cir. June 7, 2019) (internal quotation marks and citations omitted). Williams argues only that he experienced disparate treatment on account of his race. He does not allege that Scragg's pre-employment tests had a disparate impact on African American applicants for MPA positions in the WMC.

long as the employer's evidence meets these requirements, the employer "need not persuade the court that it was actually motivated by the proffered reasons" to meet its burden at this stage. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

An analysis of these factors shows that the Smithsonian has met its burden. First, Williams does not contest the admissibility of any evidence proffered by the Smithsonian, so the court will consider this evidence in its analysis. *Cf. Ali v. D.C. Gov't*, 810 F. Supp. 2d 78, 83 (D.D.C. 2011) ("Rule 56 allows a party . . . opposing summary judgment to object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.") (citing Fed. R. Civ. P. 56(c)(2)) (quotation marks omitted).

Second, the evidence would allow a factfinder to reasonably conclude that the Smithsonian was motivated by a legitimate, non-discriminatory reason to fire Williams. The Smithsonian required that MPAs in the WMC satisfy an objective, measurable performance standard—a minimum accuracy level of 95 percent. Def. Stat. Mat. Facts ¶ 7. Williams' accuracy rating consistently fell below this level. *Id.* ¶¶ 15, 17. During a mid-year performance review, Scragg notified Williams that his accuracy rating was 94 percent, just below the minimum acceptable level. *Id.* At the time, Scragg nonetheless expressed confidence in Williams and was optimistic that his performance would improve as he gained more experience. Def.'s Ex. 16 at 9. Instead, Williams' performance continued to decline. Def.'s Stmt. Mat. Facts ¶¶ 5, 20. Between April and July 2013, his accuracy decreased to 90.6 percent, a significant drop in a "detailed-critical" setting that demanded near-perfect work product. *Id.* Based on this metric alone, Williams' performance was 7.6 percent below that of the next-lowest analyst in the WMC, showing that he was lagging behind others in the office. *Id.* ¶ 22. As his accuracy rating declined, Williams' average completion time doubled, and was tied for the slowest response time

in the WMC.  *Id.* ¶ 20.  Others, beyond Scragg, commented on Williams' performance as well. John Kerns, the WMC team lead who worked alongside Williams, observed errors in his work on job plans and preventative maintenance schedules.  *Id.* ¶ 13.  Williams has not rebutted any of the Smithsonian's evidence showing that his performance as an MPA fell below minimum requirements.

Courts have recognized an employee's subpar performance as evidence that an employer had a legitimate, non-retaliatory explanation for terminating the employee.  *See George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (observing that "performance below the employer's legitimate expectations" is one of the "two most common" "legitimate reasons for discharge") (citation omitted); *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 295  (D.D.C. 2015) (holding that "poor and deteriorating job performance is a legitimate, nondiscriminatory reason for firing plaintiff") (internal quotation marks and citation omitted); *Simmons v. Cox*, 495 F. Supp. 2d 57, 66–67 (D.D.C. 2007) (recognizing employer's proffered nondiscriminatory reason for terminating an employee where performance evaluations documented the employee's "unsatisfactory level of work").  Even assuming the presence of a genuine factual dispute with respect to Williams' culpability for the major data errors that occurred in late June through early July 2013, *see* Def's Stmt. Mat. Facts ¶ 26–30; Williams Dep. at 66:3–73:19, the undisputed evidence in the record regarding Williams' substandard performance by July 2013 shows that a factfinder would "reasonably be able to find that the [Smithsonian's] action was motivated by a nondiscriminatory reason."  *Figueroa*, 923 F.3d at 1088.

Third, the substantial evidence of Williams' substandard performance during his tenure as an MPC renders the Smithsonian's nondiscriminatory explanation for separating him facially credible.

Finally, the undisputed facts in the record show that the Smithsonian has provided the requisite "clear and reasonably specific explanation" for the materially adverse action in question. The Smithsonian's consistent claim—one directly supported by the record—that it decided to discharge Williams because of his unsatisfactory job performance gave Williams a clear opportunity to challenge the asserted justification as merely a pretext for unlawful racial discrimination.

Because its evidentiary proffer satisfies all four *Figueroa* factors, the Smithsonian has met its burden to offer a legitimate, nondiscriminatory reason for terminating Williams' employment.

> b. *Williams has not presented evidence which might establish that the Smithsonian's explanations for his separation were a pretext for racial discrimination.*

Since the Smithsonian presented a legitimate, nondiscriminatory reason for discharging Williams, the court considers whether he "produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory reason was not the actual reason and that the employer intentionally discriminated against [him] on the basis of race . . . ." *Brady*, 520 F.3d at 494. "Although a jury may ultimately decide to credit the version of the events described by [defendant] over that offered by [plaintiff], this is not a basis upon which a court may rest in granting a motion for summary judgment." *Leavitt*, 407 F.3d at 413.

Williams could establish a reasonable inference of discrimination at this stage by showing, *inter alia*, that the employer's stated nondiscriminatory reason for the adverse employment action is "false." *Czekalski*, 475 F.3d at 366. He could similarly meet his burden by showing "changes and inconsistencies in the stated reason for the adverse action," demonstrating that the employer failed to comply with established criteria or procedures related

to the action, or showing "that a factual determination underlying an adverse employment action is egregiously wrong." *Wang*, 206 F. Supp. 3d at 67–68 (quoting *Burley v. Nat'l Rail Passenger Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015)).

Williams suggests the Smithsonian's claims regarding his unsatisfactory performance are inconsistent with the facts. He alleges he was "caught . . . off guard" by Scragg's accusation that he was responsible for the major data errors in late June 2013 because he had not previously received any negative feedback for his performance. Pl.'s Opp'n at 4. Although Williams cites no facts in the record to support this assertion, Scragg's comments in Williams' mid-year performance appraisal in April 2013 support this claim and thus establish a genuine dispute of fact on this issue. While Scragg, in the appraisal, notified Williams that he was failing to meet minimum data accuracy levels, Scragg's overall assessment of Williams' performance trajectory and fitness for the position was positive. Def.'s Ex. 16 at 9.

However, given the undisputed evidence that Williams' accuracy levels substantially declined from April to July 2013, classifying his mid-year appraisal as a positive evaluation does not create an inference of pretext. *See Gonda*, 79 F. Supp. 3d at 299 ("Instances of positive feedback do not suggest pretext given the substantial evidence that [an employee's] superiors were dissatisfied with work performance and [an employee's] failure to improve."). While his mid-year review was generally positive, Williams concedes facts that show that he not only failed to subsequently improve his accuracy, as Scragg instructed in the April appraisal, but instead produced increasingly less accurate work in the months that followed. For the same reasons, Scragg's recommendation letter for Williams in April 2013 does not provide countervailing evidence that the Smithsonian's explanation for his firing was pretextual. Pl.'s Ex. A at 000014.

Even if Scragg's conclusion that Williams was responsible for the major data errors in late June and early July 2013 was a motivating factor in William's termination, the court cannot conclude that this "factual determination underlying [the] adverse employment action" was "egregiously wrong." *Wang*, 206 F. Supp. 3d at 68. While there is a genuine factual dispute regarding William's culpability for failing to catch the systems error, this dispute, too, is immaterial. In light of the other evidence confirming that Williams was consistently performing at an unsatisfactory level by July 2013, the dispute regarding his culpability for this particular mistake does not render the Smithsonian's nondiscriminatory explanation for his discharge pretextual. Because the Smithsonian's "stated belief about the underlying facts is reasonable in light of the evidence," *id.* at 68 n.7 (quoting *Brady*, 520 F.3d at 495), a jury "cannot conclude that [the Smithsonian] is lying" about the reasons for Williams' separation. *Wang*, 206 F. Supp. at 68 n.7.

Williams similarly fails to present any facts to defend his claim that "Mr. Scragg began to unfairly single him out for poor work performance" prior to his termination. Def.'s Stmt. Mat. Facts ¶ 12. While the D.C. Circuit has found summary judgment improper when a reasonable jury could conclude that the employer's review of the employee's performance or conduct was "colored by racial discrimination," *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006), this case does not raise any such concern. Williams does not challenge the methodology of the accuracy ratings, present any facts to show that his job performance was stronger than his ratings reflect, or otherwise suggest that these statistics were anything but objective and accurate measurements of his performance as an MPA. Therefore, this case is readily distinguishable from those in which an employer relies heavily on subjective criteria when making employment decisions, which, as the D.C. Circuit has recognized, can be a vehicle

for disguising discrimination. *See Wang*, 206 F. Supp. 3d at 71 (citing *Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012)).

Although Williams does not raise this argument in his opposition brief, the court also notes the absence of any evidence in the record suggesting that the Smithsonian—and Scragg specifically—failed to comply with established agency criteria or procedures in conjunction with Williams' separation. *See Wang*, 206 F. Supp. 3d at 68. Moreover, the policies related to the probationary employment period provide the Smithsonian with substantial flexibility to discharge a probationary employee who, like Williams, "fails to demonstrate fully his qualifications for continued employment." Def.'s Stmt. Mat. Facts ¶ 2.

Alternatively, Williams can avoid summary judgment at the pretext stage by pointing to "evidence of discriminatory statements or attitudes on the part of the employer," *Mastro*, 447 F.3d at 855, which can include facts related to the employer's "general treatment of minority employees." *Wang*, 206 F. Supp. 3d at 68. While evidence that Scragg treated Williams less favorably than comparator employees of a different race would support an inference of discrimination, such a showing is not necessary. *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 575–76 (1978).

Williams does not rely on a comparator-based argument. *See* Pl.'s Opp'n at 11. He does not dispute the Smithsonian's statement that there were no similarly situated employees supervised by Scragg who had performance issues during their probationary employment period. Def.'s Stmt. Mat. Facts ¶ 22. To the extent that he intended to imply a comparator issue by claiming Scragg "unfairly single[d] him out for poor work performance," Pl.'s Opp'n at 12, Williams does not defend this assertion with any evidence in the record. He offers no facts indicating that any non-African American analysts in the WMC failed to meet minimum

accuracy requirements during their probationary period but experienced no adverse employment action as a result. In fact, Williams does not dispute that by July 2013, his accuracy rating of 90.6 percent was 7.6 percent lower than that of the analyst with the next-lowest rating. Def.'s Stmt. Mat. Facts ¶¶ 20, 22. By implication, this suggests that all other analysts in Williams' office exceeded the minimum accuracy standard of 95 percent, at least over the final three months of Williams' employment in the WMC.

Most importantly, Williams argues that Scragg's practice of requiring pre-employment evaluations—which Williams alleges was only a requirement for African American applicants— evinces a racially discriminatory attitude that supports an inference that his discharge was the result of intentional discrimination. *See* Pl.'s Opp'n at 12. The record shows that Scragg required three MPA applicants (including Williams) to complete a pre-employment assessment, and that all three were African American. Pl.'s Ex. A at 000003; Def.'s Stmt. Mat. Facts ¶ 1. According to Williams, this pattern, combined with Simenton's statement that the assessments were not an authorized part of the application process, gave him "reason to believe that Mr. Scragg only applied pre-employment tests to African American candidates." Pl.'s Opp'n at 12. Scragg, by contrast, claims that he required all candidates for a given vacancy to complete the same evaluation, and that he required these assessments to evaluate skills he believed were important to the MPA position. Scragg Dep. at 46:11–13, 51:7–12, 54:1–6, 128:15–21. The record contains no additional evidence to corroborate Scragg's statement.

While the evidence is not inconsistent with Williams' assertion that only African Americans were required to complete pre-employment assessments, it does not support a reasonable inference that "the employer's asserted nondiscriminatory reason [for discharging Williams] was not the actual reason and that the employer intentionally discriminated against

[him] on the basis of race . . . ." *Brady*, 520 F.3d at 494. Both Williams and Tamia Rush—two of the three African American MPA applicants discussed in the record—were hired by Scragg after completing pre-employment tests. The D.C. Circuit has noted that "'[w]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire,' especially 'when the firing has occurred only a short time after the hiring.'" *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)); *see also Coghlan v. Am. Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2004) ("[A]n employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs."). Absent any evidence that Scragg did not require non-African American applicants for vacant MPA positions to complete a test, Scragg's decision to hire both Williams and Rush runs directly counter to an inference that he harbored any discriminatory animus against African American candidates.

Although Scragg's initial decision to hire Williams "does not *alone* suffice for summary judgment," it nonetheless "is probative evidence" that Scragg did not intentionally discriminate against Williams when he discharged him less than one year later. *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (emphasis in original). In *Waterhouse*, the D.C. Circuit found that the absence of a "genuine issue regarding [an employee's] failure to fulfill her basic job responsibilities," when considered alongside the fact that the same supervisor had both hired and fired the employee, entitled the employer to summary judgment, even when the supervisor had allegedly made a discriminatory comment during the employee's tenure. 298 F.3d at 994. If the circumstances in *Waterhouse* do not yield a permissible inference of unlawful

discrimination, then the facts in this case—which show Scragg repeatedly hired African American applicants while using the pre-employment assessments, and do not indicate that Scragg made any racially discriminatory comments—certainly do not.

Williams' expressed concerns regarding the "inconsistencies with pre-employment tests that were given to Tamia Rush . . . and himself" do not affect this analysis.  Pl.'s Ex. A at 000014.  Given that both Williams and Rush are African American, the court cannot infer any racial discrimination from the fact that Rush was only required to take one test, while Williams had to take two.  Def.'s Stmt. Mat. Facts ¶ 1; Pl.'s Ex. A at 000003.

Finally, Williams contends that the Smithsonian did not provide him with adequate training to perform his duties as an MPA.  Specifically, he argues that he received detailed training on the ticket generation system for the first time on July 3, 2013, and that Scragg then "unfairly discharged Plaintiff without being given a chance to implement what he learned from the July 3 training."  Pl.'s Opp'n at 12 –13; Pl.'s Ex. A at 000034–37.

Even viewing the evidence in the light most favorable to Williams, this claim is unpersuasive.  Nothing in the record indicates that the Smithsonian refused to provide training opportunities to Williams while offering them to other new hires.  Additionally, Williams' performance plan expressly indicated that MPAs should exhibit "a minimal need for supervisory direction" and "[s]erve as CMMS subject matter expert on all scheduled maintenance activities and associated processes."  Def.'s Stmt. Mat. Facts ¶¶ 7–8.  In the absence of any evidence to the contrary, this undisputed information suggests that the Smithsonian expects those entering the position to demonstrate a mastery of CMMS processes without needing formal, detailed training.  Moreover, the performance plan indicates that Williams requested and received an Excel training class in February 2013, which runs counter to an inference that the Smithsonian prevented

Williams from taking steps to improve the skills needed for his position. Def.'s Ex. 16 at 6. While evidence showing that similarly situated Smithsonian employees received training opportunities that were denied to Williams might support an inference of discrimination, Williams offers none.

Because Williams has not pointed to evidence supporting a reasonable inference that the Smithsonian's legitimate, nondiscriminatory explanation for his termination was a pretext for intentional race discrimination, summary judgment for the Smithsonian is appropriate on Williams' discrimination claim.

### B.  Williams' Retaliation Claim

Title VII's anti-retaliation provision makes it unlawful for an employer "to discriminate against [an] employee [] … because he has opposed any practice" prohibited by Title VII (known as the "opposition clause") or "has made a charge, testified, assisted, or participated in" a Title VII proceeding (known as the "participation clause"). 42 U.S.C. § 2000e-3(a); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006). Williams did not initiate Title VII proceedings prior to his termination. He initially contacted the Smithsonian's EEO office on July 29, 2013, six days after he was fired. Def.'s Stmt. Mat Facts ¶ 38. Therefore, his claim that he was subject to retaliation as a result of his complaints regarding Scragg's pre-employment evaluations invokes only Title VII's opposition clause.

Like Title VII discrimination claims, Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999). To establish a prima facie case of unlawful retaliation, an employee must demonstrate: "(1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because'

the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012).

Once a defendant proffers a legitimate, nondiscriminatory reason for the materially adverse

action, the question of whether a plaintiff established a prima facie cases is generally "no longer

relevant." *Wiley v. Glassman*, 511 F.3d 151, 156 (D.C. Cir. 2007) (quoting *United States Postal

Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). Instead, once a defendant

proffers such a reason, the court must "proceed[] to the ultimate issue of retaliation *vel non*."

*Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009); *see Morales v. Gotbaum*, 42 F. Supp. 3d

175, 188 (D.D.C. 2014).

> 1. The Smithsonian has articulated a legitimate, non-retaliatory reason for
>    separating Williams from his position.

Since the Smithsonian does not dispute that Williams' firing constitutes a materially

adverse action, the court need not proceed with an initial inquiry into whether Williams made out

a prima facie case of unlawful retaliation. Because the *McDonnell Douglas* framework applies

to Title VII retaliation claims as well as discrimination claims, *Figueroa* guides this court's

analysis of whether the Smithsonian has adequately demonstrated a legitimate,

nondiscriminatory rationale for separating Williams from his probationary employment. *See

Santos v. Barr*, No. 17-321, 2019 WL 2504101, at *8 (D.D.C. June 17, 2019) (applying *Figueroa*

to a Title VII retaliation claim). For the reasons previously discussed in section III.A.2.a, *supra*,

the Smithsonian's evidentiary proffer satisfies the four *Figueroa* factors, and the Smithsonian

therefore has met its burden of offering a legitimate, non-retaliatory reason for discharging

Williams.

2. <u>Williams has failed to show that the Smithsonian's legitimate, nondiscriminatory explanation was a pretext for unlawful retaliation.</u>

Because the Smithsonian has offered a legitimate, nondiscriminatory explanation for separating Williams, the burden reverts to Williams to point to evidence that "creates a material dispute on the ultimate issue of retaliation." *Jones*, 557 F.3d at 678. He can do so "either directly by [showing] that a discriminatory [or retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). When evaluating whether a plaintiff has met this burden, the court considers "'all the evidence,' which includes not only the prima facie case but also the evidence the plaintiff offers 'to attack the employer's proffered explanation for its action' and other evidence of retaliation." *Jones*, 557 F.3d at 677 (quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)).

In contrast to Title VII discrimination claims, "there are no mixed-motive retaliation claims." *Duncan v. Johnson*, 213 F. Supp. 3d 161, 184–85 (D.D.C. 2016). In order to survive summary judgment at the final stage, a plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"—in other words, that the retaliation was the "but-for cause" of the materially adverse action. *Morales*, 42 F. Supp. 3d at 188 (quoting *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "Under the but-for standard, it is not sufficient for [a plaintiff] to demonstrate that a reasonable jury could find that retaliatory animus by her supervisor was a cause for the . . . subsequent termination. Rather, [a plaintiff] must demonstrate that there is a genuine issue of material fact as to whether retaliatory animus was *the* cause for the . . . subsequent termination." *Gonda*, 79 F. Supp. 3d at 303 (emphasis in original). "A plaintiff can meet this burden by casting doubt on the objective validity of the employer's explanation."

*Duncan*, 213 F. Supp. 3d at 189 (quoting *Morris v. McCarthy*, 825 F.3d 658, 671 (D.C. Cir. 2016)).

By choosing not to dispute most of the facts involving his unsatisfactory work performance, Williams fails to raise doubts about the "objective validity" of the Smithsonian's explanation for separating him. The facts indicating that Williams' work for the WMC did not meet minimum accuracy requirements—which Williams does not dispute—support this conclusion. *See Gonda*, 79 F. Supp. 3d at 303 ("The existence of unrebutted facts about [plaintiff's] unsatisfactory work performance would make it impossible for a jury to conclude that retaliatory animus was the only cause for [plaintiff's] . . . subsequent discharge."). By not rebutting any of the Smithsonian's facts related to his performance statistics, Williams never challenges the veracity of these objectively measurable standards of his job performance. Again, even assuming a genuine dispute of fact regarding his responsibility for the major data errors in June through July 2013, the uncontested facts establish that he fell short of meeting the WMC's minimum standards for his position.

Moreover, the Smithsonian notified Williams that his work was failing to meet expectations and provided him with performance evaluations, both formal and informal, during his employment. Def.'s Stmt. Mat. Facts ¶¶ 11–13, 15–18. During Williams' mid-year performance review in April 2013, Scragg notified him that his accuracy rating was below the minimum requirement and suggested best practices for improving his performance. *Id.* ¶¶ 15–18. According to the Smithsonian's employment policies, the purpose of the probationary period is "to determine the fitness of the employee," and the Smithsonian "shall terminate [the employee's] services during this period if [he] fails to demonstrate fully his qualifications for continued employment." *Id.* ¶ 2. Based on the facts not in dispute, Williams has conceded that

he fell short of fully demonstrating his qualifications to continue serving as an MPA by July 2013.

Further, Williams identifies no direct evidence from which a jury could reasonably infer that retaliatory animus motivated the decision to discharge him. To support his argument that the Smithsonian's performance-based rationale for separating him was merely pretextual, Williams claims that "Mr. Scragg began to unfairly single him out for poor work performance." Pl.'s Opp'n at 12. As discussed in section III.A.2.b, *supra*, this contention lacks support from the record. Moreover, it is inconsistent with Williams' failure to dispute the Smithsonian's evidence that all MPAs in the WMC were subject to the same minimum accuracy requirements, and that others in the position surpassed these standards. And while there is a factual dispute regarding whether Williams received any negative feedback from Scragg prior to July 2013, this does not call into question the objective validity of the Smithsonian's cited reasons for discharging Williams, given the uncontroverted facts showing that his performance decreased markedly in the months following his mid-year appraisal.

To support his position that the retaliation claim should survive summary judgment, Williams relies most heavily on his July 9, 2013 exchange with Scragg, in which Scragg asked Williams and co-worker Chris Butler, "What kind of trouble are you troublemakers getting into?" Pl.'s Ex. A at 000033. Williams argues that this evidence satisfies the causation element of a prima facie case of retaliation, which requires showing (1) the employer had knowledge of the employee's protected activity, and (2) a close temporal proximity between the protected activity and the retaliatory event. *Duncan*, 79 F. Supp. 3d at 301. Because this exchange occurred later on the same day that he communicated complaints about the pre-employment tests to Simenton, Williams contends that Scragg's behavior serves as circumstantial evidence that

Scragg knew about Williams' protected activity.[4]  *See Jones*, 557 F.3d at 679 (stating an employee "need only offer circumstantial evidence that could reasonably support an inference" that an employer had knowledge of protected activity); *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006).

Even at the prima facie stage, where the plaintiff bears only a "minimal burden" to establish an inference of causation, *Holcomb*, 433 F.3d at 903, Williams' argument is unpersuasive.  Notwithstanding the close proximity in time between his conversation with Simenton and the cubicle exchange with Scragg, the brief conversation does not provide enough circumstantial evidence to create a genuine dispute with respect to whether Simenton informed Scragg of Williams' complaints.[5]  Other than the exchange at the cubicle, Williams identifies nothing in the record to rebut either Simenton or Scragg's statements that Simenton never conveyed the content of her conversations with Williams to Scragg.  Even viewing the facts in the light most favorable to Williams, Scragg's remarks at the cubicle do not reasonably support an inference that he knew of Williams' complaints.  Thus, without more evidence, Williams fails to establish a permissible inference of a causal connection.

Even assuming this evidence created a reasonable inference of *a* retaliatory motive, such an inference would not end the causation inquiry.  As the D.C. Circuit has explained, "positive evidence beyond mere proximity [and defendant's knowledge of protected activity] is required to defeat the presumption that the proffered explanations are genuine."  *Hamilton v. Geithner*, 666

---

[4] The court assumes for the purposes of argument that Williams engaged in protected activity by conveying his concerns about the pre-employment evaluations to Simenton.  Since the causation question is dispositive here, the court need not decide whether these communications qualify as protected activity.

[5] The temporal proximity between Williams' protected activity and his subsequent separation from the Smithsonian is not at issue.

F.3d 1344, 1359 (D.C. Cir. 2012) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)).  Here, the scant circumstantial evidence Williams offers is not enough to support a conclusion that the Smithsonian's reason for discharging him is "unworthy of credence."  *Jones*, 557 F.3d at 678.  The undisputed evidence that Williams' work product fell below objective accuracy requirements, the fact that Scragg had directly notified him of the need to improve his performance on at least one occasion, and the highly performance-contingent nature of the probationary employment period lead the court to conclude that Williams has failed to show "that *no* adverse action would have been taken if [he] had not complained [of alleged discrimination]."  *Gonda*, 79 F. Supp. 3d at 303.

The Smithsonian has presented an objectively valid, nondiscriminatory reason for Williams' discharge that would "make it impossible for a jury to conclude that retaliatory animus was the only cause" for his separation from employment.  *Id.*  Because Williams has not met his burden to show that the proffered reason for the action was pretextual, the Smithsonian is entitled to summary judgment on the retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, the court finds that the Smithsonian is entitled to judgment as a matter of law on both claims.  The Smithsonian's motion for summary judgment will therefore be GRANTED.

A corresponding Order will issue separately.


Date:  August 16, 2019


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge